## Bartley v. Commonwealth.

June 1, 1945.

154

J. Erwin Sanders and W. L. Bowling for appellant.

Eldon S. Dummit, Attorney General, and Guy H. Herdman, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—Affirming.

The first question to be decided on this appeal of John Bartley from a conviction of voluntary manslaughter for the killing of his wife, Flora Bartley, at their home on Big Branch Creek in Pike County, is the legality of the jury. The regular panel was exhausted when twelve of its members had qualified to sit in the case. The Commonwealth peremptorily challenged two of them and their places were filled with bystanders without objection. Eight of the twelve then went out on peremptory challenge of the defendant. Over the objection of the defendant, whose motion to draw the venire from the jury drum was overruled, the court directed the summoning of enough bystanders to complete the jury, and that was done. When there are over three vacancies in the regular panel of petit jurors at the time of selecting a jury in a civil case, it is the duty of the judge to draw double the number of names from the drum to fill the panel; but in a criminal case if the panel shall be exhausted by challenge, it is discretionary with the judge whether he will supply the jurors by drawing from the drum or directing the summoning of bystanders. KRS 29.280; Crim. Code of Practice, Sec. 192; Williams v. Commonwealth, 254 Ky. 277, 71 S. W. 2d 626; Galloway v. Commonwealth, 293 Ky. 766, 170 S. W. 2d 594. In this case the condition arose from excusing members of the regular panel by peremptory challenge, and the court but exercised a discretion vested in him. The appellant submits that this was an abuse of discretion, saying in his brief that there was an inflamed condition in the county by reason of recent sensational homicides near Pikeville. Such condition was not revealed in the record or other facts submitted as reasons for the court not having the rest of the jury chosen from bystanders. In the absence of some factual basis

in the record, obviously we cannot say that the trial court abused his discretion.

The appellant contends that he was entitled to a peremptory instruction of acquittal. About eighteen months before the killing, the defendant had married the deceased, who brought ten of her eleven children to his four-room home where he had four children by a former marriage. At the time of the killing, August 22, 1944, six or seven of her children and three of his were living there. Some of the little girls had a quarrel in their playing, and one or more of her children came in the house to tell their mother about it. It was after supper and, as one of the witnesses said, "setting into dark." The mother was busy in the kitchen and the defendant was also there making shavings of a stick of wood with which to build a fire the next morning. One of his children accused Chloe Ann, her thirteen-year-old daughter, of being in the fuss. She denied it and the defendant told her to hush, that he knew she was in it. She replied that she did not have to hush, and he threw and struck her in the head with a small stick. Her mother told him not to hit her any more, and he told her to hush or "he would cut her guts out." She went into a bedroom and he followed her and the children followed him. He then cut her, although the two children say it was dark in the room. Not a word was spoken until their mother said, "Lord, John, you have cut me," and then, "Lord, John, you have cut my guts out." Such is the testimony of Chloe Ann and her eleven-year-old sister, Mildred. A nineteen-year-old son of the deceased, Junior Johnson, had laid down across the bed in another room and gone to sleep. The first thing he heard was his mother saying, "John, don't you hit any more of my children." After the man and woman had gone into the other bedroom, he heard his mother say something he could not understand, and then, "John, you are choking me to death." He then went in there and saw the defendant ahold of his mother around her neck or shoulder. He took hold of him and he turned her loose. This witness did not testify to anything about the cutting or his mother having been cut or making any such statements as the little girls testified. On cross-examination he testified that when the defendant started to the porch he said, "Lord have mercy; what happened?" and then "broke and went back in the kitchen."

The cross-examination of these witnesses, particularly the two girls, developed variations and contradictions. This is especially so with reference to the conduct of the defendant immediately afterward. We believe, as testified by a neighbor who arrived soon and the admissions on cross-examination of the two children, that the defendant at once tried to stop the flow of blood and to minister to his wife, as he testified he did.

The defendant denied categorically the evidence of the three witnesses of the Commonwealth concerning his statements to the girl and to his wife, and stated he merely tossed a little stick on which he had been whittling and it accidentally struck the child. It was six or eight inches long and no bigger than his finger. His story is that he went into the bedroom with the knife without thinking about having it in his hand. It was very sharp. He walked up behind his wife and she suddenly turned in the semi-darkness and accidentally came in contact with the point of the knife. It is made clear by a doctor and the undertaker that the end of the knife penetrated her left groin or front side, just above the hip bone, and had punctured, but not severed, the large artery going into her leg. The wound was about the width of the knife blade and was an inch or an inch and a half deep.

There was some evidence that the parties had had some difficulty a few weeks before over the conduct of one of the woman's daughters, and she had left the defendant and gone to her former home for three weeks. On the other side, he testified he had been with her there part of the time, and a neighbor related that the wife had later spoken about how good her husband was to her.

The character of the wound is strong evidence supporting the claim of the defendant. It seems unnatural for a man bent upon killing his wife merely to have stuck the knife in her body at such a place and inflicted a wound which would have been only superficial except for the presence of the artery so near the outside. The provocation, if any, was slight. The testimony of the two little girls, one eleven and the other thirteen years old, is variable and manifests exaggerations which are so prevalent in children of that age concerning a grave and exciting matter. At one time they would have been

regarded as incompetent to bear testimony. It is significant that they had been staying with some of their mother's people just before the trial. The testimony of the son is also weakened in some particulars, e.g., neither of the girls said anything about their mother being choked, and he said nothing about her exclaiming she was cut. But the trial judge and the jury, seeing and hearing these witnesses, were better able to weigh their evidence than we are, and it was their prerogative to accept their testimony as describing the actual facts. We cannot by any means say that as a matter of law the defendant should have gone acquit.

We find no merit in the argument that the corpus delicti was not established because no witness testified that the woman's death was the result of the wound. It is true that the cause of death cannot be presumed to have been through a criminal agency, but the woman had been stabbed, an artery was punctured, she bled profusely, became unconscious in a few minutes, and died within a half hour. A doctor who examined the body, as he was asked, "for wounds that would cause her death," stated he had, and then described them. This was sufficient evidence to authorize the jury to believe that the stabbing caused her death.

The voluntary manslaughter instruction was predicated upon killing in sudden affray or sudden heat of passion and done "willfully and not in his necessary or apparently necessary self-defense." The appellant argues the instruction was erroneous as not incorporating the element of "intentional" cutting. The following instruction, however, defined the word "willfully" as meaning "intentionally."

The appellant is right in his contention that there was no place for a self-defense instruction, since the killing was either accidental or felonious. But we cannot agree that the giving of such an instruction confused the jury or otherwise was prejudicial. Howard v. Commonwealth, 260 Ky. 467, 86 S. W. 2d 126.

No instruction on involuntary manslaughter based upon the careless or negligent use of a deadly weapon was given. If it be agreed that it may have been criminal negligence for the man to go so close to his wife with an open, sharp knife in his hand, we do not think

the omission of an instruction upon that theory was prejudicial. The verdict was for fifteen years imprisonment, which indicates that had an involuntary instruction been given, it would have been ignored. Had the penalty been fixed at the minimum for voluntary manslaughter, then there would be reason to say that had the jury been authorized to fix a lesser penalty, they might have done so.

The acting commonwealth's attorney stated to the jury in his closing argument, "John did not come to his wife's aid immediately and try to stop the bleeding, but ran back through the house and stayed until he had time to think, and his lawyers had time to think." The bill of exceptions shows this was made in response to something the defendant's attorney had said. It appears to have been legitimate argument excepting the reference to the lawyers, and that could not have been harmful. The statement, "You should not only punish him for what he done, but should add to that sentence additional time as an example for others," appears only in the motion for a new trial and cannot be considered because not in the bill of exceptions. But if it were, we would have to hold it to be legitimate argument.

The defendant claimed a new trial upon the ground that he had been taken by surprise at hurtful testimony of Junior Johnson. He filed his own and affidavits of others to the effect that the witness had previously made statements as to what he would testify, which testimony would have been helpful to the defendant and in some respects corroborated him. It is a rule of general application that a new trial will be seldom granted upon newly discovered evidence which is merely contradictory, impeaching or cumulative in character. The defendant made no motion for a suspension of the trial on account of the surprise that he might be given an opportunity to obtain rebuttal or impeaching testimony in addition to his own. The court did not rule erroneously in denying the motion. Taylor v. Commonwealth, 269 Ky. 656, 108 S. W. 2d 645.

The judgment must be and it is affirmed.